UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- against -

ERNEST BROWN,

　　　　　　　　　　Defendant.

---

**MEMORANDUM**
**OPINION & ORDER**

22 Cr. 266 (PGG)

---

PAUL G. GARDEPHE, U.S.D.J.:

　　　　　Defendant Ernest Brown is charged with knowingly possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1).  (Indictment (Dkt. No. 1))  On July 22, 2022, Brown moved to suppress firearms and ammunition recovered during a March 4, 2022 search of his apartment, as well as statements he made during and after the search.  (Def. Mot. (Dkt. No. 11))  For the reasons stated below, Brown's motion to suppress will be denied.

## BACKGROUND

### I.     BROWN'S AFFIRMATION

　　　　　In support of his motion to suppress, Brown submitted an affirmation that sets forth the following version of events.  On March 4, 2022, Brown and his "14-year-old daughter, Lailanee, were in [their] home located at 663 East 234th Street, apartment 1, in the Bronx." (Brown Affm. (Dkt. No. 20-1) ¶ 2)  That morning, Brown answered a "knock at [his] door . . . and saw [his] parole officer and at least three other officers."  (Id. ¶ 3)  "The officers entered [his] home and asked" if he consented "to them conducting a search of [his] home."  (Id. ¶ 4)  Brown answered that he "did not consent to a search of [his] home . . . [and] also did not sign any document at that time agreeing to a search of [his] home."  (Id.)  With respect to a consent to

search form introduced by the Government (GX 2), Brown contends that that document does not bear his signature.  (Id. ¶ 5)

## II.    **EVIDENTIARY HEARING**

On November 9, 2022, this Court conducted an evidentiary hearing concerning Brown's suppression motion.  The Government called New York state parole officer Laura Wilder, the Defendant's parole officer.  (Hearing Tr. (Dkt. No. 34) at 5-6, 11)[1]  Defendant called no witnesses.  The evidence at the hearing showed the following:

On February 26, 2015, Brown was convicted in Supreme Court of the State of New York, New York County, of criminal possession of a weapon in the second and third degree.  He was sentenced to three to six years' imprisonment and five years' post-release supervision.  (GX 1; Hearing Tr. (Dkt. No. 34) at 3)  On February 7, 2019, Brown was released to parole and began serving his five-year period of supervision, then scheduled to end on February 8, 2024.  (GX 1; Hearing Tr. (Dkt. No. 34) at 3)  At that time, Brown signed a certificate of release in which he agreed to "permit [his] Parole Officer to visit [him] at [his] residence and/or place of employment and . . . permit the search and inspection of [his] person, residence and property."  (GX 1; Hearing Tr. (Dkt. No. 34) at 13-14)

On February 28, 2022, Brown's ex-girlfriend called 911 and reported that Brown had threatened to murder her with a gun.  (Hearing Tr. (Dkt. No. 34) at 3, 30-31; Brown Parole Rept. (Dkt. No 17-3) at 3-4)  On March 2, 2022, New York City Police Department ("NYPD") Detective Caruso shared this information with Parole Officer Wilder and asked that she conduct a search of Brown's home.  (Hearing Tr. (Dkt. No. 34) at 30-31)

---

[1] The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

On March 4, 2022, at approximately 5:00 a.m., Officer Wilder met with a team of parole officers to prepare for the search of Brown's home later that morning.  (Id. at 11-12, 45)  Before departing for Brown's apartment, Wilder accessed the New York Department of Community Corrections and Supervision ("DOCCS") "CMS system" and verified that Brown was still on parole.  (Id. at 63-64)

At approximately 7:00 a.m., Wilder and four other parole officers and several NYPD officers arrived at Brown's apartment to conduct a "home safety inspection."  (Id. 10-11, 14, 47-48)  The parole officers knocked on Brown's door, and he answered the door.  The parole officers told Brown that they wanted to perform a "safety inspection check" and asked for permission to do so.  (Id. at 15) Brown verbally consented.  (Id.)  Pursuant to DOCCS policy, parole officers handcuffed Brown and "put him in a secure area" of the apartment.  (Id. at 15, 55-56)  Wilder and her colleague, Parole Officer Ramirez, then conducted a "visual walk through" or "safety sweep" of Brown's apartment "to see who else is in the home or [if] there [are] . . . items that[] [are] unsafe to be in the home that could hurt either the team or the parolee."  (Id. at 10, 15)  Brown's teenage daughter, who lives in the apartment, was present at the time of the search.  (Id. at 15-16, 49)

During the "visual walk through" of a bedroom, the parole officers observed in plain view a handgun in an open drawer.  (Id. at 16-17; GX 7 (photo of handgun found in Brown's bedroom))  Because the bedroom contained mail addressed to Brown, the parole officers concluded that that bedroom was his.  (Hearing Tr. (Dkt. No. 34) at 15)

The parole officers then returned to the "area where Mr. Brown was secured" and "reiterated [to him that they were] . . . going to continue [the] search, safety search, and [] asked him if it was OK, and he said yes."  (Id. at 17)  At the direction of Supervisory Parole Officer

Campbell, however, Wilder then sought Brown's written consent for the search, as an "extra precautionary measure[]." (Id. at 12, 17, 46)  Wilder showed Brown a document containing his New York State parole pedigree information. (Id. at 17-20; GX 2)  On this document Wilder had written the following:  "7:15 Subject gave PO Wilder permiss[ion] verbally to search entire house." (GX 2)  After reading the document, Brown – whose hands were handcuffed behind his back – scribbled marks on the document, thereby indicating his consent. (Hearing Tr. (Dkt. No. 34) at 17-20; GX 2)  Wilder then added an "X" and a signature line immediately below the text she had handwritten, and asked Brown to sign on the line. (Hearing Tr. (Dkt. No. 34) at 18; GX 2)  Brown – who remained handcuffed – then made some markings just below the X, near and on the signature line, again indicating his consent to the search. (Hearing Tr. (Dkt. No. 34) at 18-19; GX 2)

NYPD officers recorded portions of the search via body cameras.  One such recording shows Parole Officer Ramirez explaining to Brown that "parole conducted a search in your presence authorized by you."  In the video, Brown does not dispute that he consented to the search. (GX 5-T (transcript of body-cam clip); Hearing Tr. (Dkt. No. 34) at 25)

In addition to the handgun recovered from an open drawer in Brown's bedroom, the officers recovered "two long guns, handcuffs, ammunition, a shield, [and a] handcuff key" in the apartment. (Hearing Tr. (Dkt. No. 34) at 26; GX 6 (photo of firearms and other evidence seized in the apartment))

This Court found Officer Wilder to be a fully credible witness.

## DISCUSSION

In moving to suppress the evidence seized from his apartment, and statements he made during and after the search, Brown argues that (1) he was no longer on parole as of

March 4, 2022, making the warrantless search of his apartment unlawful; and (2) he did not provide verbal or written consent to the search of his apartment, and any consent he did provide was not voluntary.  (Def. Mot. (Dkt. No. 11); Def. Reply (Dkt. No. 20); Def. Post-Hearing Br. (Dkt. No. 33) at 4-8)

The Government argues that the warrantless search of Brown's apartment was lawful because (1) he was on parole at the time of the search; (2) even if Brown was not on parole, the parole officers acted in the good faith belief that he was on parole; and (3) Brown provided verbal and written consent to the search.  (Gov't Opp. (Dkt. No. 17); Gov't Post-Hearing Opp. (Dkt. No. 36))

## I.      WARRANTLESS SEARCH OF A PAROLEE'S RESIDENCE

### A.      Applicable Law

The Fourth Amendment guarantees that the people shall be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV.  A warrantless search is "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions."  United States v. Katz, 389 U.S. 347, 357 (1967).

While "a parolee's home, 'like anyone else's, is protected by the Fourth Amendment's requirement that searches be reasonable,'" United States v. Braggs, 5 F.4th 183, 186 (2d Cir. 2021) (quoting Griffin v. Wisconsin, 483 U.S. 868, 873 (1987)), "parolees have severely diminished privacy expectations by virtue of their status alone." Samson v. California, 547 U.S. 843, 844 (2006).  Thus, "[u]nder the Special Needs Doctrine, a parole officer may search a parolee so long as the search is reasonably related to the performance of the officer's duties." Braggs, 5 F.4th at 184, 186;  United States v. Barner, 666 F.3d 79, 84 (2d Cir. 2012) ("[T]he determination as to whether a warrantless parole search 'was unreasonable and thus prohibited by constitutional proscription must turn on whether the conduct of the parole officer

was rationally and reasonably related to the performance of the parole officer's duty.'" (quoting People v. Huntley, 371 N.E.2d 794, 797 (N.Y. 1977))).  "Among these duties are the supervision, rehabilitation, and societal reintegration of the parolee, as well as assuring that 'the community is not harmed by the [parolee's] being at large.'" Braggs, 5 F.4th at 187 (quoting Griffin, 483 U.S. at 875) (alteration in Braggs).  In this regard, the Second Circuit has ruled that a parole officer's search of a parolee's home after receiving "an anonymous tip suggesting that [the parolee] had guns in his possession – a clear violation of his parole conditions – . . . [is] constitutionally permitted."  (Id. at 188).

      **B.**   **Analysis**

        Brown does not dispute that – if he was on parole on March 4, 2022 – the search of his home was constitutionally permissible as a parole search.  (See Def. Mot. (Dkt. No. 11) at 3-4 (acknowledging that "parolees have a diminished expectation of privacy that can justify warrantless searches"))  Brown argues, however, that he was no longer on parole as of March 1, 2022, based on the "credit" he received under New York's Less is More Act (the "Act") (id.; Def. Reply (Dkt. No. 20) at 3-7), which took effect on March 1, 2022.  Under the Act, a parolee's term of supervised release is reduced by 30 days for every 30 days of supervised release the parolee completes without violating the conditions of his or her release, retroactive to the initiation of their supervised release.  N.Y. Penal L. § 70.40(4); 2021 Sess. Law News of N.Y. Ch. 427 § 10 (S. 1144-A).

        Brown was released to parole on February 7, 2019.  (GX 1; Def. Bail Mot. (Dkt. No. 12) at 3; Gov't Opp. (Dkt. No. 17) at 7)  The parties agree that his original parole discharge date was February 8, 2024, and that – after application of Brown's "earned time credits" – his adjusted parole discharge date would precede the March 1, 2022 effective date of the Act. (GX 1; Def. Reply (Dkt. No. 20) at 3; Gov't Opp. (Dkt. No. 17) at 9)  The parties further agree

that on March 21, 2022, DOCCS awarded Brown his earned time credits, and calculated his adjusted parole discharge date.  (Def. Reply (Dkt. No. 20) at 6; Gov't Opp. (Dkt. No. 17) at 9)

Brown contends that, under the Act, he was discharged from parole as of March 1, 2022, the Act's effective date, and that accordingly the warrantless search of his apartment on March 4, 2022 was unlawful.  (Def. Reply (Dkt. No. 20) at 3)  The Government argues that Brown was discharged from parole on March 21, 2022, and that the March 4, 2022 search was a lawful parole search.  (Gov't Opp. (Dkt. No. 17) at 9)

### 1.     The Less is More Act's Effective Date

In resolving questions of statutory interpretation, courts must begin "with the language of the statute itself."  United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241 (1989) (citation omitted); see also United States v. Robinson, 702 F.3d 22, 31 (2d Cir. 2012) (analysis begins "with the plain language of the statute").  The "starting point" of any statutory interpretation exercise "is the statute's plain meaning, if it has one."  United States v. Dauray, 215 F.3d 257, 260 (2d Cir.2000) (citation omitted).

Under the New York Penal Law, as amended by the Act, "[r]etroactive earned time credits shall be awarded to eligible persons subject to community supervision at the time this legislation becomes effective."  N.Y. Penal Law § 70.40(c).  The Act's effective date provision states that it

> shall take effect March 1, 2022; provided, however, that the amendments made to subparagraph (xi) of paragraph (f) of subdivision 3 of section 259–i of the executive law made by section six of this act shall take effect on the same date and in the same manner as such chapter of the laws of 2021 takes effect; provided however, within six months of such effective date, the department of corrections and community supervision in consultation with the board of parole shall calculate and award all earned time credits pursuant to subdivision 4 of section 70.40 of the penal law as added by section two of this act to all persons serving a sentence subject to community supervision at the time this legislation becomes law retroactive to the initial date such person began his or her earliest period of community supervision prior to any revocation of community supervision.

> Provided further, however, within ten months of becoming law the department of corrections and community supervision in consultation with the board of parole shall identify all individuals incarcerated for a sustained violation of community supervision and recalculate such individual's time assessment in accordance with this act. Effective immediately, the addition, amendment and/or repeal of any rule or regulation necessary for the implementation of this act on its effective date are authorized to be made and completed on or before such effective date.

2021 Sess. Law News of N.Y. Ch. 427 § 10 (S. 1144-A).

In his initial brief, Brown argued that his "discharge date from parole was February 7, 2022" – three weeks before the Act became law.  (Def. Mot. (Dkt. No. 11) at 2)  In his reply, Brown changes his analysis, arguing that his discharge from parole occurred on March 1, 2022, when the Act became law:  "[t]he plain language of the Act . . . compels the conclusion that the earned time credit to which a supervisee is entitled is awarded, by operation of law, on March 1, 2022."  (Def. Reply (Dkt. No. 20) at 5)

Under Brown's new reading, the six-month period the Act grants to DOCCS and the parole board to "calculate and award all earned time credits" is merely "a finite deadline by which [DOCCS] was required to afford supervisees the benefit of the new law."  (Id. at 6)  The six-month period is not an implementation period for DOCCS and the parole board to determine earned time credits, but merely sets a deadline by which time DOCCS and the parole board must complete the "ministerial" act of calculating parolees' new discharge dates.  (Id. at 5-6)[2]

Brown further argues that "where[, as here,] the defendant had no prior violations, had already served more than half his [sentence], and where DOCCS would be commencing a Fourth Amendment search of a person's home, DOCCS has an obligation [under the Act] to do a time calculation [of a defendant's backdated discharge date] absent exigency."  (Def. Post-

---

[2]  Brown represents that the "bill jacket" for the Act "is silent as to the intent behind § 10[, the effective date provision]."  (Id. at 6 n.1)

Hearing Br. (Dkt. No. 33) at 4)  Brown contends that DOCCS' failure to do such a calculation

before the instant search amounts to "deliberate, reckless, [and] grossly negligent conduct" in

violation of the Fourth Amendment, warranting suppression.  (Id.)

          The Government argues that Brown was still on parole as of March 4, 2022,

because the Act contains a six-month implementation period for DOCCS and the parole board to

complete their calculations of parolees' earned time credits under the Act.  (Gov't Opp. (Dkt.

No. 17) at 12-19)

          Acknowledging that the Act's effective date is March 1, 2022, see 2021 Sess.

Law News of N.Y. Ch. 427 § 10 (S. 1144-A), and that the Act provides that "[r]etroactive earned

time credits shall be awarded to eligible persons subject to community supervision at the time

this legislation becomes effective," N.Y. Penal Law § 70.40(c), Brown's argument ignores the

fact that the Act grants DOCCS and the parole board six months to "calculate and award all

earned time credits" under the Act.  2021 Sess. Law News of N.Y. Ch. 427 § 10 (S. 1144-A).

The Court will refer to the six-month period set forth in the Act as the "implementation period."

          The clause granting the implementation period follows and modifies the "take

effect" clause, as indicated by the phrase, "provided however."  The obvious legislative purpose

behind the implementation period was to give DOCCS and the parole board time to "calculate

and award all earned time credits" for the thousands of New York State parolees whose parole

terms would be modified as a result of the Act.  These calculations could not be performed

overnight.  Accordingly, the legislature provided for a six-month implementation period in which

DOCCS and the parole board would calculate and award each parolee's earned time credits and

determine each parolee's adjusted discharge date.  Legislation that did not provide for an implementation period would have led to chaos.[3]

Brown argues, however, that the use of the term "retroactive" in Section 10 and in New York Penal Law § 70.40(4)(c) means that the "earned time credits" are awarded, and some parolees are effectively discharged, on March 1, 2022.  (Def. Reply (Dkt. No. 20) at 5 (citing Fernandez-Vargas v. Gonzalez, 548 U.S. 30, 37 (2006)))  But Defendant misapprehends how the term "retroactive" is used in the Act.

The Act provides that DOCCs and the parole board "shall calculate and award all earned time credits . . . to all persons serving a sentence subject to community supervision at the time this legislation becomes law retroactive to the initial date such person began his or her earliest period of community supervision prior to any revocation of community supervision." 2021 Sess. Law News of N.Y. Ch. 427 § 10 (S. 1144-A).  The term "retroactive" is used to make clear that DOCCS and the parole board must calculate a parolee's "earned time credits" based on all time the parolee served on parole, including time served before the Act's effective date of March 1, 2022.  See Fernandez-Vargas, 548 U.S. at 37 ("[I]t has become 'a rule of general application' that 'a statute shall not be given retroactive effect unless such construction is required by explicit language or by necessary implication.'" (quoting United States v. St. Louis, S.F. & T. R. Co., 270 U.S. 1, 3 (1926))).  But the use of the term "retroactive" does not alter the fact that the legislature granted DOCCS and the parole board a six-month implementation period to "calculate and award all earned time credits" under the Act.

---

[3]  Brown contends that interpreting the six-month clause as an implementation provision, rather than as a deadline, "would thwart the Act's express language mandating the award of earned time credit on the date of its enactment."  (Def. Reply (Dkt. No. 20) at 6)  But this argument ignores the fact that the implementation period clause modifies the Act's "take effect" provision, as discussed above.

Because of the Act's implementation period, Brown was not automatically discharged from parole on March 1, 2022, the effective date of the Act. He was discharged from parole on March 21, 2022, when DOCCS and the parole board exercised their authority and responsibility under the Act to calculate and award Brown his "earned time credits."

### 2. Whether Parole Officers Are Required to Seek a Calculation of Earned Time Credits, and a Determination of the Adjusted <u>Discharge Date, Before Undertaking Supervisory Activity</u>

As discussed above, on Monday, February 28, 2022, Brown's ex-girlfriend called 911 and reported that Brown had threatened to murder her with a gun. (Hearing Tr. (Dkt. No. 34) at 3, 30-31; Brown Parole Rept. (Dkt. No 17-3) at 3-4) On Wednesday, March 2, 2022, NYPD Detective Caruso contacted Parole Officer Wilder, advised her of the girlfriend's 911 call, and asked that she conduct a search of Brown's home. (Hearing Tr. (Dkt. No. 34) at 30-31)

On Friday, March 4, 2022 – prior to leaving to perform a search of Brown's residence – Officer Wilder accessed DOCCS' "CMS system" and confirmed that Brown was still on parole. (<u>Id.</u> at 63-64)

DOCCS personnel in the agency's central office in Albany are responsible for calculating earned time credit and determining revised parole discharge dates under the Less is More Act. (<u>Id.</u> at 9, 64) Wilder did not contact DOCCS personnel in Albany to request that they perform the necessary calculations. (<u>Id.</u> at 64)

Brown argues that Officer Wilder was required to do more than access DOCCS' computer system to confirm that Brown was still on parole. According to Brown, Officer Wilder was required to ask DOCCS to calculate Brown's "earned time credits" – and determine his adjusted parole discharge date under the Less is More Act – before addressing the girlfriend's

report that Brown had threatened to murder her with a gun.  (Def. Post-Hearing Br. (Dkt. No. 33) at 4)[4]

Nothing in the Act suggests that Officer Wilder was required to contact DOCCS' Albany office and request a calculation of his earned time credit before engaging in supervisory activity regarding Brown – particularly given the recent 911 call in which Brown's girlfriend reported that he had threatened to murder her with a gun.  The Less is More Act makes clear that "the department of corrections and community supervision in consultation with the board of parole shall calculate and award all earned time credits," 2021 Sess. Law News of N.Y. Ch. 427 § 10 (S. 1144-A), and – as discussed above – the Act provides for a six month implementation period for DOCCS and the parole board to complete that task.  The Act does not contemplate, much less mandate, individual parole officers contacting DOCCS Albany office on an ad hoc basis before taking necessary supervisory activity as to particular parolees.

Brown's interpretation of the Act would require hundreds of parole officers throughout the state – before undertaking supervisory action regarding thousands of parolees – to obtain from DOCCS' Albany office a calculation of earned time credits and a determination as to updated parole discharge date.[5]  But the obvious purpose of the six-month implementation period was to avoid the ad hoc, chaotic approach that Brown envisions.

---

[4]  Brown also argues that Officer Wilder "had independent knowledge . . . that Mr. Brown was no longer on parole" on March 4, 2022.  (Def. Post-Hearing Reply (Dkt. No. 37) at 2 (citing Hearing Tr. (Dkt. No. 34) at 29, 32))  But Wilder did not testify that she "knew" Brown was no longer on parole at the time of the search.  While Wilder understood that Brown might benefit from "earned time credits" under the Act, she believed that he remained on parole until DOCCS issued an updated discharge date reflecting his earned time credits.  (See Hearing Tr. (Dkt. No. 34) at 29-32, 64)

[5]  While Brown argues that the number of parolees impacted by the Act is "quite limited" (Def. Post-Hearing Br. (Dkt. No. 33) at 4), by March 31, 2022, DOCCS had discharged more than 8,000 parolees pursuant to the Act.  NY DOCCS Press Release, New York State Department of

The Court concludes that the Act did not require Officer Wilder to contact DOCCS's Albany office and obtain a calculation of his earned time credit and a determination as to his adjusted parole discharge date before undertaking supervisory action as to Brown, particularly given the circumstances here.  The Court finds that Officer Wilder's supervisory actions in relation to Brown were performed in the good faith belief that he was on parole, a fact that she confirmed on the DOCCS website before conducting the search.[6]  The Court further concludes that Brown was discharged from parole on March 21, 2022, when DOCCS and the parole board calculated and awarded Brown's earned time credits and determined his adjusted parole discharge date.  (NY DOCCS Record (Dkt. No. 17-5); Def. Reply (Dkt. No. 20) at 6 (agreeing that March 21, 2022 is the date on which "DOCCS processed Mr. Brown's retroactive earned time credit"))

Defense counsel has stated that the only issue regarding the March 4, 2022 search of Brown's residence is whether he was still on parole as of that date.  (See Def.

---

Corrections and Community Supervision Expedites Less is More Act Releases Ahead of September Deadline, March 28, 2022, https://doccs.ny.gov/new-york-state-department-corrections-and-community-supervision-expedites-less-more-act-releases.

[6] "[W]hen [law enforcement officers] act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrent value of suppression is diminished, and exclusion [is not warranted]."  Davis v. United States, 564 U.S. 229 (2011); see also, e.g., United States v. Smith, 967 F.3d 198, 211 (2d Cir. 2020) ("[T]he exclusionary rule applies only if the police have violated the Constitution deliberately, recklessly, or with gross negligence, or if a constitutional violation is the product of recurring or systemic negligence.").  Even assuming arguendo that Brown was not on parole as of March 4, 2022, this Court "cannot say that a reasonably well-trained officer in [Wilder's] position would have known" that the Act required her to seek an ad hoc calculation of Brown's adjusted discharge date from DOCCS and the parole board.  Smith, 967 F.3d at 212 (holding that an unreasonable delay in applying for a warrant did not justify exclusion in light of unclear Fourth Amendment precedent at the time of the officer's conduct).  And given the recent enactment of the Less is More Act, any error on Wilder's part cannot be characterized as "the product of recurring or systemic negligence."  Id. at 211.

Post-Hearing Reply (Dkt. No. 37) at 3 n.1 ("Were the Court to find that Mr. Brown was

in fact on parole at the time of the search, the defense would not contest the entry's

validity."))  There is no question that Officer Wilder's search of Brown's residence was

"reasonably related to the performance of [her] duties," and it is likewise undisputed that

Brown was not permitted to possess firearms.  (See Conditions of Release (Dkt. No. 17-

1) at 1)  See also Braggs, 5 F.4th at 184, 186.  Having considered all of the circumstances,

the Court concludes that the search of Brown's residence was a constitutional parole

search.  See Braggs, 5 F.4th at 188 (search of parolee's home after receiving "an

anonymous tip suggesting that [the parolee] had guns in his possession – a clear violation

of his parole conditions – . . . was constitutionally permitted").[7]

## II.   CONSENT TO SEARCH

The Government contends that – even if the search of Brown's residence was not

a constitutional parole search – the search was lawful because of Brown's consent.  (Gov't Opp.

(Dkt. No. 17) at 19-24; Gov't Post-Hearing Opp. (Dkt. No. 36) at 7-11)  Defendant argues that he

did not voluntarily consent to the search of his residence.  (Def. Reply (Dkt. No. 20) at 7; Def.

Post-Hearing Br. (Dkt. No. 33) at 5-8; Def. Post-Hearing Reply (Dkt. No. 37) at 3-4))

### A.   Applicable Law

Another "of the specifically established exceptions to the requirements of both a

warrant and probable cause is a search that is conducted pursuant to consent."  Schneckloth v.

Bustamonte, 412 U.S. 218, 219 (1973); see also United States v. Hernandez, 85 F.3d 1023, 1028

---

[7]  Because Brown was on parole on March 4, 2022, the parole officers did not violate his Fourth
Amendment rights even absent consent.  As Brown acknowledges, the officers' entry was lawful
given his status as a parolee.  (Def. Post-Hearing Reply (Dkt. No. 37) at 3 n.1)  See Braggs, 5
F.4th at 186 ("[U]nder the Special Needs Doctrine, a parole officer may search a parolee so long
as the search is reasonably related to the performance of the officer's duties.").

(2d Cir. 1996) ("It is well settled that a warrantless search does not violate the Fourth Amendment if 'the authorities have obtained the voluntary consent of a person authorized to grant such consent.'") (quoting <u>United States v. Elliott</u>, 50 F.3d 180, 185 (2d Cir. 1995)).

"The government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary." <u>United States v. Isiofia</u>, 370 F.3d 226, 232 (2d Cir. 2004) (citing <u>United States v. Calvente</u>, 722 F.2d 1019, 1023 (2d Cir. 1983)); <u>see also</u> <u>Anobile v. Pelligrino</u>, 274 F.3d 45, 61 (2d Cir. 2001) ("The official claiming that a search was consensual has the burden of demonstrating that the consent was given freely and voluntarily."). Consent is voluntary where it is "a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." <u>United States v. Garcia</u>, 56 F.3d 418, 422 (2d Cir. 1995). "Voluntariness is a question of fact determined by a 'totality of all the circumstances.'" <u>Isiofia</u>, 370 F.3d at 231 (quoting <u>Schneckloth</u>, 412 U.S. at 227). "'[T]he ultimate question presented is whether "the officer had a reasonable basis for believing that there had been consent to the search."'" <u>Id.</u> (quoting <u>Garcia</u>, 56 F.3d at 423 (quoting <u>United States v. Sanchez</u>, 32 F.3d 1330, 1334 (8th Cir. 1994))).

### B.  **Analysis**

#### 1.  **Whether Brown Provided Consent**

Officer Wilder testified that – after arriving at Brown's apartment – the parole officers knocked on the door, Brown answered the door, and the officers explained that they were there to conduct a "safety inspection check." Pursuant to DOCCS policy, Brown was handcuffed. The officers asked Brown for permission to search his apartment, and Brown gave verbal consent to search. (Hearing Tr. (Dkt. No. 34) at 10-11, 15, 47-48, 55-56) During the parole officers' subsequent "visual walk through" of the apartment, Officers Wilder and Ramirez discovered a handgun in plain view in a drawer in Brown's bedroom. (<u>Id.</u> at 15-17) The parole

officers then told Brown that they were "going to continue [the] search, safety search, and []
asked him if it was OK, and he said yes." (Id. at 17)  At the direction of her supervisor, Wilder
then sought Brown's written consent to the search. (Id. at 12, 17, 46)  Brown agreed to provide
written consent.  With his hands handcuffed behind his back, Brown read and scribbled on a
document on which Officer Wilder had written:  "7:15 Subject gave PO Wilder permiss[ion]
verbally to search entire house."  In scribbling on the handwritten consent form, Brown provided
his written consent to search. (Id. at 17-20, 54-55; GX 2)

       As noted above, the Court observed Officer Wilder's testimony on these points,
and finds her testimony entirely credible.

       In his affirmation, Brown denies that he provided verbal consent to search.  He
also states that he "did not sign any document at that time agreeing to a search of my home."
(Brown Aff'm. (Dkt. No. 20-1) ¶ 4)  Brown does not address whether he made the scribbles on
the form Officer Wilder presented to him.  In asserting that he did not consent to the search,
Brown points to (1) the absence of his signature on the form Officer Wilder presented to him; (2)
"the officers' decision not to uncuff Mr. Brown to sign the consent form"; and (3) the parole
officers' failure "to use their phone cameras to record his purported verbal or written consent."
(Def. Post-Hearing Br. (Dkt. No. 33) at 6; Def. Post-Hearing Reply (Dkt. No. 37) at 3-4)

       Acknowledging that Officer Wilder's testimony and Brown's affirmation present
a factual dispute concerning the consent issue, this Court finds Officer Wilder's testimony more
credible than Brown's affirmation.  Officer Wilder's testimony was subjected to extensive cross-
examination, and she maintained her credibility throughout her testimony.  Brown's statements
in his affirmation have not been subjected to cross-examination.  Given these circumstances, this
Court will give more weight to Officer Wilder's testimony than Brown's affirmation.  See, e.g.,

United States v. Fuentes, 2007 WL 2319142, at *4 (S.D.N.Y. Aug. 10, 2007) (crediting witness testimony over defendant's affidavit regarding whether he gave consent); United States v. Robles, 253 F. Supp. 2d 544, 549 n.14 (S.D.N.Y. 2002) (noting that courts "'give greater weight to [witness] testimony, which was subject to cross examination, than to [sworn] affidavits'" (quoting United States v. Gardner, 611 F.2d 770, 774 n.2 (9th Cir. 1980)) (alterations in original)); United States v. Juliano, 2000 WL 1206745, at *3 n.1 (S.D.N.Y. Aug. 24, 2000) (affording less weight to defendant's affidavit, because the court could not assess defendant's credibility and the testimony of Government witnesses was "forthright and truthful") (citing United States v. Frank, 8 F. Supp. 2d 284, 291 (S.D.N.Y. 1998)).

 Having weighed Officer Wilder's testimony and Brown's affirmation, the Court accepts Wilder's account that (1) Brown gave verbal consent to search after parole officers knocked on his door; (2) she showed Brown her handwritten consent to search form; (3) Brown read the handwritten form; (4) Brown agreed to provide written consent to search; and (5) Brown made scribbles on the form intended to convey his written consent to search.

 As to Brown's argument that there is no legible signature reflecting his consent to search, the fact that Brown's consent is reflected in scribbles rather than in a legible signature is of no moment.  The issue is whether – considering "'the totality of all the circumstances'" – "'the officer had a reasonable basis for believing that there had been consent to the search.'" Isiofia, 370 F.3d at 231 (quoting first Schneckloth, 412 U.S at 227, and second Garcia, 56 F.3d at 423).  Given that Brown gave Officer Wilder verbal consent to search; agreed to provide her with written consent to search; and made scribbles on the handwritten consent to search form intended to reflect his consent, Officer Wilder "'had a reasonable basis for believing that there had been consent to search.'"  Garcia, 56 F.3d at 423 (quoting Sanchez, 32 F.3d at 1334-35).

Brown argues, however, that the fact that he was handcuffed when he made his scribbled markings on the consent form demonstrates that Officer Wilder knew that he was unwilling to sign the consent form.  According to Brown, "the only logical reason that the officers did not uncuff Mr. Brown to sign the document is because they knew he would not have signed it."  (Def. Post-Hearing Br. (Dkt. No. 33) at 6)  Officer Wilder credibly testified, however, that during searches parolees are handcuffed as a matter of DOCCS policy.  (Hearing Tr. (Dkt. No. 34) at 55-56)

And while Brown complains that his consent to search was not captured on video, the Government is not required to demonstrate a defendant's consent to search through any particular means.  It is sufficient for the Government demonstrate by a preponderance of the evidence that consent was provided.  See Isiofia, 370 F.3d at 232; see also United States v. Ray, 541 F. Supp. 3d 355, 406 (S.D.N.Y. 2021) ("The fact that FV-2's consent was not recorded in the 302 report does not provide evidence of such falsity on its own.")

The Court also notes that – in an exchange that was recorded – Brown did not dispute Parole Officer Ramirez's statement that "parole conducted a search in your presence authorized by you."  (GX 5-T (transcript of body-cam clip); Hearing Tr. (Dkt. No. 34) at 25)

For all these reasons, the Court finds that the Government has demonstrated that Brown provided both oral and written consent to the search of his apartment on March 4, 2022.

### 2.        Whether Brown's Consent was Voluntary

Brown contends that any consent he provided to the search was "involuntary and the product of coercion."  In this regard, Brown argues that (1) he was "handcuffed and surrounded by officers" when he provided consent; (2) he consented out of "concerns over the safety and welfare of his 14-year-old daughter and his dogs"; and (3) he believed that he was still

on parole at the time of the search, and that any consent he provided was mere "acquiescence to authority and could not be deemed voluntary." (Def. Post-Hearing Br. (Dkt. No. 33) at 7-8)

Courts consider the "'totality of all the circumstances'" in determining whether consent to search was voluntarily given. United States v. Snype, 441 F.3d 119, 131 (2d Cir. 2006) (quoting Isiofia, 370 F.3d at 230). "[I]n light of the 'endless variations in the facts and circumstances implicating the Fourth Amendment,' [courts eschew any] . . . 'litmus-paper test.'" United States v. Montes-Reyes, 547 F. Supp. 2d 281, 286 (S.D.N.Y. 2008) (quoting Ohio v. Robinette, 519 U.S. 33, 39 (1996)). Facts bearing on voluntariness include, inter alia, (1) the "'[defendant's] age, education, [and] intelligence'"; (2) the "'length of detention'"; (3) the "'use of physical punishments or deprivations'"; (4) "'whether the alleged consenting person was advised of his constitutional rights'";[8] (5) "whether the defendant was in custody and in handcuffs"; (6) "whether there was a show of force"; (7) "whether the agents told the defendant that a search warrant would be obtained"; (8) "whether the defendant previously had refused to consent";[9] (9) whether the officers threatened or mistreated the defendant's family;[10] and (10) whether the officers lied or otherwise psychologically coerced the defendant to obtain his consent.[11]

---

[8] United States v. Puglisi, 790 F.2d 240, 243 (2d Cir.1986) (citing Schneckloth, 412 U.S. at 226; see also Schneckloth, 412 U.S. at 226 (noting that "the government need not establish such knowledge [of the consenting person's constitutional rights] as the sine qua non of an effective consent").

[9] Phillips v. Cnty. of Orange, 894 F. Supp. 2d 345, 371 (S.D.N.Y. 2012) (quoting U.S. v. Echevarria, 692 F.Supp.2d 322, 336-37 (S.D.N.Y.2010)).

[10] See, e.g., United States v. Curry, 442 F. Supp. 3d 833, 839 (S.D.N.Y. 2020) ("[A] threat that [the defendant] could lose custody of her son might render her consent involuntary.").

[11] See, e.g., Bumper v. North Carolina, 391 U.S. 543, 546-50 (1968) (search found unconstitutional where police falsely claimed to have a search warrant for defendant's home, and this lie prompted defendant's grandmother to consent to a search).

Although Brown submitted an affirmation in support of his motion to suppress, he does not assert in his affirmation that – if he consented to the search of his apartment – he did so only because he (1) was "handcuffed and surrounded by officers"; (2) was worried about his daughter and his dogs; and (3) believed he was on parole, and thus merely acquiesced in the search.  (See Brown Aff'm (Dkt. No. 20-1))  There is thus no evidentiary support for Brown's assertions in his brief (Def. Post-Hearing Br. (Dkt. No. 33) at 7-8) that his consent was motivated by these factors.

The evidence before this Court demonstrates that Brown's consent was voluntary. As an initial matter, Brown – who is 49-years-old (see GX 2 at 1 (providing Defendant's date of birth) – has a lengthy record of interactions with law enforcement officers.  (GX 1 (noting Brown's 2015 weapons conviction); Brown Parole Rept. (Dkt. No 17-3) (documenting dozens of interactions with various parole officers); Gov't Opp. to Bail Mot. (Dkt. No. 15) at 4-5 (noting that Brown "has previously been convicted of violating at least 12 different criminal laws"))  In 2015, he was convicted of criminal possession of a weapon.  He served three years in prison, and he had served three years of supervised release by the time of the search.  While Brown was on parole, Officer Wilder had visited his apartment on a number of occasions.  (GX 1; Hearing Tr. (Dkt. No. 34) at 3, 37; Brown Parole Rept. (Dkt. No 17-3)).

Brown consented to the search of his apartment quickly and unequivocally each of the three times that Officer Wilder sought his consent.  (Hearing Tr. (Dkt. No. 34) at 15, 17, 54-55 (first, verbally, after the officers initially entered the apartment; second, verbally, after the safety sweep; and third, in writing))  His consent was not the product of interrogation, much less lengthy interrogation.  Brown also appeared "calm" and at ease throughout the search.  (Id. at 25) Indeed, the video footage of the search shows Brown joking with the parole officers that he

"shouldn't have opened the door this morning."  (GX 4; GX 4-T)  Brown also discusses his

music career with the officers.  (GX 3 at 52:12)  In sum, there is no evidence that Brown's will

was overborne by "'the [officers'] use[] [of] intimidating or coercive language or gestures,'"

United States v. Moreno, 701 F.3d 64, 77 (2d Cir. 2012), or by any other means.

    As to Brown's assertion that he was in handcuffs when he provided consent,

neither the fact that a person "is in custody nor that []he has been subjected to a display of force

rules out a finding of voluntariness."  Moreno, 701 F.3d at 77.  Voluntariness is determined

based on the "totality of all the circumstances." Id. at 76 (emphasis in original).  Indeed,

voluntary "[c]onsent to a search has been found despite formal arrest, . . . and such additional

aggravating circumstances as handcuffing of a suspect, the presence of six law enforcement

officers in his home, and their assurance that they would remain indefinitely and secure a search

warrant if consent were withheld."  Garcia, 56 F.3d at 423 (citing United States v. Kon Yu-

Leung, 910 F.2d 33, 41 (2d Cir. 1990)); see also United States v. Ansaldi, 372 F.3d 118, 129 (2d

Cir. 2004) ("The fact that police drew their guns to effectuate the arrest does not necessarily

establish coercion, neither does the fact that Gates was handcuffed.").

    As noted earlier, Brown does not assert in his affirmation that he gave consent to

search because he was handcuffed.  Nor is there any evidence that Brown complained that the

handcuffs were causing him discomfort or that he asked that they be removed, or that he was

subjected to any lengthy interrogation or "intimidating or coercive language or gestures" in

conjunction with his being handcuffed.  The evidence instead indicates that Brown was

handcuffed pursuant to DOCCS policy and not for any coercive purpose.  (Hearing Tr. (Dkt. No.

34) at 55-56)  Given the circumstances discussed above, the fact that Brown was handcuffed

does not indicate that his consent was involuntary.

In arguing that the handcuffing makes a finding of voluntary consent impossible, Brown cites to two fifty-year-old cases:  United States v. Gregory, 204 F. Supp. 884, 885 (S.D.N.Y. 1962) and United States v. Lewis, 274 F. Supp. 184, 188 (S.D.N.Y. 1967).  (Def. Post-Hearing Br. (Dkt. No. 33) at 6)  Neither case supports Brown's argument.

Gregory is irrelevant here, because the case contains no discussion whatsoever of handcuffing.  The court rejected the Government's consent to search argument in that case because the agents' testimony on this point was not credible.  Gregory, 204 F. Supp. at 884-85 (granting motion to suppress after finding agents' testimony that the defendant consented to a search incredible; "a defendant at once denying that narcotics are in his room and at the same time agreeing to a search [which] obviously must yield narcotics[] is not in accord with common experience").

In Lewis, four FBI agents arrested the defendant for a parole violation outside his apartment building.  Lewis, 274 F. Supp. at 186.  The agents suspected that the defendant was operating an illegal still in his apartment, and while the defendant was "under arrest, handcuffed and surrounded by four arresting officers," they asked whether he would agree to a search of his apartment.  Id. at 186, 188. The defendant allegedly "replied 'Sure' or 'OK.'"  Id. at 186.  The court noted that "[a]mong the factors that may be considered in determining" whether consent was voluntary are whether the defendant "was overpowered by arresting officers, handcuffed, or similarly subject to physical restrictions."  Id. at 187 (citing cases).  The court went on to find that the evidence of voluntary consent was lacking because (1) the defendant consented while under arrest and handcuffed; (2) the officers had already frisked the defendant and removed his apartment key from his pocket before asking for his consent, "which undoubtedly was construed by him as indicating that they were in any event going to search his apartment"; (3) when the

22

agents asked the defendant whether he had a still in his apartment, he said no; and (4) the defendant "attempted, when one of the agents said 'Let's go to your apartment,' to lead the agents in a direction away from where his apartment was actually located." Id. at 188.

Lewis provides no support for Brown's argument. While the court mentioned that the defendant was handcuffed, none of the other facts cited by the Lewis court are present here: Brown was not told that he was under arrest; Brown did not deny that firearms were present in his apartment or otherwise attempt to mislead the parole officers; and the parole officers did not take custody of the key to Brown's apartment. Lewis also applies a legal framework that was superseded long ago, including a requirement that voluntary consent be established by "'clear and convincing evidence.'" Id. at 187. As discussed above, the Government's burden here is to prove voluntary consent by a preponderance of the evidence – not by "clear and convincing evidence." Isiofia, 370 F.3d at 232.

As to Brown's argument that he gave consent to search only out of concern for his teenage daughter and his dogs (Def. Post-Hearing Br. (Dkt. No. 33) at 8), there is no evidence (in Brown's affirmation, in the hearing testimony, or in the video recordings of the search) that Brown provided consent out of fear for their safety. Indeed, there is no evidence that he feared for their safety at all. "While a threat that [Brown] could lose custody of [his daughter] might render [his] consent involuntary, . . . [Brown] does not assert that the officers ever made such a threat or mistreated [his daughter]." Curry, 442 F. Supp. 3d at 839; see also United States v. Sylla, 2010 WL 582575, at *9 (E.D.N.Y. Feb. 16, 2010) ("Nor is there evidence that the agents treated [the defendant's] family in such a way as to taint his consent.").

Finally, Brown argues that – because he mistakenly believed that he was still on parole – "any purported consent he provided was merely an acquiescence to authority and could

not be deemed voluntary."  (Def. Post-Hearing Br. (Dkt. No. 33) at 8)  As discussed above, this Court has concluded that Brown was on parole as of March 4, 2022.  But assuming <u>arguendo</u> that Brown was not on parole, there is no evidence that he consented to the search in the mistaken belief that he was on parole.

   As discussed above, Brown does not assert in his affirmation that he consented to the search because he believed that he was on parole.  (<u>See</u> Brown Aff'm (Dkt. No. 20-1)  There is likewise no evidence that (1) Wilder made any representation to Brown as to his parole status, or (2) Brown referred to his parole status during the search.

   The Court concludes that the Government has met its burden to demonstrate, by a preponderance of the evidence, that Brown's consent to search was voluntary.

## <u>CONLUSION</u>

   For the reasons stated above, Brown's motion to suppress (Dkt. No. 11) is denied.

Dated:  New York, New York
   January 13, 2023

            SO ORDERED.


            Paul G. Gardephe
            United States District Judge